749 So.2d 722 (1999)
AMERICAN GULF V, INC.
v.
HIBERNIA NATIONAL BANK.
No. 99-CA-376.
Court of Appeal of Louisiana, Fifth Circuit.
November 10, 1999.
*723 Douglas S. Draper, New Orleans, for Plaintiff/Appellant.
John M. Mamoulides, Metairie, Corinne Ann Morrison, Robert S. Rooth, James C. Young, Lou Anne Milliman, New Orleans, William W. Hall, Metairie, for Defendant/Appellee.
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY and MARION F. EDWARDS.
DALEY, J.
The plaintiff applied for a loan at Hibernia National Bank, (Hibernia). He was issued two letters of commitment for a 5.5 million dollar loan. These commitment letters expired and plaintiff was unable to close the loan. He filed suit against Hibernia for breach of contract. Following trial, the jury returned a unanimous verdict in favor of Hibernia. After Motions for New Trial and Judgment Not Withstanding the Verdict were denied, plaintiff appealed.

FACTS:
Patrick Bossetta owned a number of companies involved in the shipping industry. In the late 1980's he formed a company known as American Gulf V, Inc., whose sole purpose was to purchase a World War II tanker and convert it into an oceangoing barge. This ship was known as the American Gulf V.(AGV). Mr. Bossetta entered into an agreement with Continental Grain Company. (Continental), in which the AGV was to be used exclusively to carry grain from the New Orleans area to Puerto Rico, where Continental sold grain.
Mr. Bossetta obtained an estimate for the cost of conversion from Bender Shipyard. In addition to the cost of the conversion itself, there were other costs involved including towing, painting, architectural and engineering services, and inspection fees.
In late 1989, Mr. Bossetta, as president of American Gulf V, applied to Hibernia for a 5.5 million dollar loan to fund the conversion. This loan was approved by the various loan committees and Hibernia issued two commitment letters, dated December 18, 1989, to Mr. Bossetta and American Gulf V, Inc. One commitment letter for a construction loan and one commitment letter for a term loan after construction. In the construction loan commitment letter, Hibernia agreed to make a 5.5 million dollar construction loan to American Gulf V, Inc. to finance the cost *724 of conversion of the ship. This letter stated that the commitment would expire if the construction loan had not closed by January 31, 1990. In the term loan commitment letter, Hibernia agreed to provide 5.5 million dollars long-term financing for the vessel after conversion. The proceeds of the term loan were to pay off the construction loan. This letter stated that the term commitment would expire on February 28, 1990 if the term loan had not closed by that date.
After these letters were issued, Continental advised Mr. Bossetta that the barge had to be equipped with a special hatch cover, known as "McGregor" hatch covers. Bender Shipyard issued a revised estimate for the costs of conversion. The addition of the McGregor hatch covers raised the cost of conversion significantly. Mr. Bossetta advised Hibernia of this increase and requested the loan amount be increased to 6.25 million dollars. The request for the increased amount was treated as a new loan. The first two committees approved the 6.25 million dollar loan, however, the senior loan committee declined the loan. By the time the 6.25 million dollar loan was denied, the commitment letters for the 5.5 million dollar loan had expired. American Gulf V, Inc. was unable to obtain financing and eventually sold the AGV to Continental.
American Gulf V, Inc. then filed suit against Hibernia seeking to recover for loss profits due to Hibernia's breach of the 5.5 million dollar loan commitment.

TESTIMONY AT TRIAL:
At the start of their case, plaintiff called Lindsey Jobe of Hibernia to the stand under cross examination. Mr. Jobe testified that he was the department manager on the American Gulf V, Inc. loan. He explained that John Baay was the primary loan officer working on the loan. Mr. Jobe testified that when commitment letters are issued, it is up to the borrower to contact the bank and ask the bank to close the loan. In this case, the plaintiff never asked the bank to close the 5.5 million dollar loan.
Mr. Jay Capouch, a former Hibernia employee, testified that he has known Mr. Bossetta since 1975. He owned stock in another of Mr. Bossetta's companies. Mr. Capouch was a member of the senior loan committee, but refrained from voting on the AGV loan because of his financial relationship with Mr. Bossetta. Mr. Capouch testified that the borrower controls the closing date on the loan. When he was employed at Hibernia, he never strictly enforced the expiration date on commitment letters. Mr. Capouch testified that after Mr. Bossetta requested the loan amount be increased to 6.25 million dollars, another Bossetta company, American Gulf I, Inc., (AGI), was sued by Zapata, for non-payment of towing services. Zapata filed a lien against all of Mr. Bossetta's ships except the AGV. In order to have the liens released. AGI was reorganized according to Chapter 11 of the bankruptcy code. Mr. Capouch testified that Hibernia had extreme concern regarding the bankruptcy and to how this would affect the 6.25 million dollar loan. After much research. Hibernia concluded the bankruptcy would not impact the AGV loan. Mr. Capouch testified that at the senior loan committee meeting in which the 6.25 million dollar loan was discussed, the chairman of the bank stated that he did not think Hibernia should do business with a customer who had a bankruptcy, even if it were in a related business. Mr. Capouch further testified that after the 6.25 million dollar loan was declined, he asked Mr. Bossetta if he intended to proceed with the 5.5 million dollar loan, and Mr. Bossetta informed him the bank told him they would not lend him the 5.5 million dollars.
Victor Swierad, a former employee of Continental, testified that he had known Mr. Bossetta since the late 1970's. While at Continental, Mr. Swierad was in charge of managing the shipping and loading of vessels and delivery of grain to the Carribean. *725 Mr. Bossetta's companies towed barges to Puerto Rico to deliver grain. During the late 1980's, the barges used by Continental were not big enough to keep up with the demand, so Mr. Bossetta came up with the idea of converting the old tanker to a barge. Continental was to have a half interest in the converted barge. The converted barge was to generate over one million dollars in profits per year. He further testified that he was informed that Hibernia would not fund the 6.25 million dollar loan, nor was the bank interested in providing any funding to the project. Mr. Swierad was unable to identify the person from Hibernia who told him the bank would not fund the project.
Patrick Bossetta took the stand and testified that he had been managing oceangoing barges and boats for 27 years. In the early 1980's he purchased the AGV and began preparing the hull for conversion into a barge. In 1989, he entered into an agreement with Continental whereby Continental would give him a contract of affreightment to haul grain to Puerto Rico using the AGV, which would generate profits of one million dollars per year. He applied for a 5.5 million dollar loan and was issued commitment letters by Hibernia. Mr. Bossetta testified that while he was aware of the expiration dates of the commitment letters, he was never told that he needed an extension on the commitment letters, and he was never sent closing documents for the 5.5 million dollar loan. He also testified that he never requested the 5.5 million dollar loan be closed.
When it became apparent that he would need additional funds to convert the ship, he asked that the loan amount be increased. He could not recall whether he requested the increase before or after the bankruptcy and lawsuit concerning AGI. He testified that he informed Hibernia immediately of the suit between AGI and the bankruptcy and never tried to hide anything relative to his financial condition from Hibernia. Mr. Bossetta testified that his accountant, Mr. DeVay, was informed by Mr. Baay of Hibernia that the 6.25 million dollar loan was not approved. Mr. Bossetta called Mr. Baay and was informed by Mr. Baay that the request for 6.25 million failed at the senior loan level. He was then told that Hibernia did not intend to honor the 5.5 million dollar commitment and was told "we don't want your businessgo elsewhere." Mr. Bossetta further testified that he contacted Mr. Jobe and was told "the same thing." Mr. Bossetta testified that Paul Gibson of Continental told him Continental would provide the additional $750.000.0 and he had a representative of Continental call Hibernia and explain that they were willing to put up the additional funds, if Hibernia would honor the 5.5 million dollar commitment. Continental was informed that Hibernia would not honor the 5.5 million dollar commitment. He testified that after the loan was declined by Hibernia, he contacted a number of other banks, but was unsuccessful in obtaining financing for the conversion of the ship.
Mr. Bossetta testified that he paid Hibernia $10,000.00 for each commitment letter. On cross-examination, he testified that he paid a total of $10,000.00 for both commitment letters. Originally Mr. Bossetta testified that he did not make any profit when he sold the AGV to Continental. On cross-examination, he was impeached with his deposition testimony that he did make a profit when he sold the ship.
On redirect, Mr. Bossetta testified that he was never informed by Hibernia why they refused to lend him any money and that he did not walk away from the 5.5 million dollar loan commitment.
At this point, the plaintiff rested its case.
The deposition testimony of Paul Gibson, the manager of capital funding in the treasury department of Continental, was read to the jury. Mr. Gibson had no knowledge of the relationship between Mr. Bossetta, AGV, and Continental. He recalled *726 that he attended a meeting with Hibernia representatives relative to this loan, but did not recall any details of the meeting or the refusal of the loan. He did not recall whether Continental was asked to guarantee this loan.
James Butler testified that from 1986 until 1991, he was in charge of Hibernia's lending law division which provided legal advice concerning lending issues. He was asked to analyze the impact of the AGV loans in relationship to the bankruptcy filed by AGI and its related companies, in light of the fact that Mr. Bossetta was personally guaranteeing 50% of the AGV loan. Mr. Butler concluded that the bankruptcy and lawsuit involving AGI would not make it impossible for AGV to perform on the loan. He testified that he had several conversations with Mr. Draper, Mr. Bossetta's attorney, regarding this loan. He was never asked for an extension of the commitment letters. Mr. Butler testified that the reason the 5.5 million dollar loan never closed was because the borrower never asked to close the loan. Mr. Butler testified that although Mr. Draper never told him specifically that AGV did not want the 5.5 million dollar loan, he was never asked to move forward on the 5.5 million dollar loan. It was Mr. Butler's impression that Mr. Bossetta was not interested in the 5.5 million dollar loan because they needed the 6.25 million dollar loan to cover the costs of converting the ship.
Mr. Butler disagreed with the testimony of Mr. Capouch that an extension to a commitment letter does not have to be in writing. Mr. Butler testified that once a commitment letter expires, the bank no longer has an outstanding commitment to lend money.
The deposition of Frank Terrell, a representative of Bendler Shipbuilding, was read to the jury. He testified that in December 1989, the total estimate for the conversion, including all costs and McGregor hatch covers was $6,817,958.00.
John Baay, the loan officer who processed the AGV loan application, testified that shortly after the 5.5 million dollar loan was approved, the plaintiff requested an increase to 6.25 million dollars. Mr. Baay testified that he was informed by Mr. DeVay that more money was needed to cover the cost of the hatch covers. He informed Mr. DeVay that it would be more difficult to get approval on this loan in light of the bankruptcy. He told Mr. DeVay perhaps they should take the 5.5 million that was already committed. Mr. DeVay responded that it was "all or nothing;" they had to have the increased funds to cover the cost of conversion because they had no other source of funds. Mr. Baay testified that had an extension on the commitment letters been requested, it would have been granted, however, an extension on the commitment letters was never requested. Based on the request for additional funds, an entirely new loan package was prepared. After being approved in the first two loan committees, the senior loan committee denied the higher loan. Mr. Baay testified that he called Mr. DeVay and informed him the loan had been declined. Mr. DeVay stated that he was going to try to obtain financing elsewhere. Mr. Baay denied ever speaking directly to Mr. Bossetta after the loan was denied. Finally, Mr. Baay testified that the bank was never asked to honor the 5.5 million dollar loan commitment.
John DeVay was called by the defendant as an adverse witness. Mr. DeVay testified that he had worked for Mr. Bossetta periodically since 1980. He was supplied financial documents to Mr. Baay in connection with the loan application. Mr. DeVay denied that he personally asked for the increased loan, but acknowledged speaking to Mr. Baay after the increase was requested. He did not recall a conversation with Mr. Baay in which he was informed the loan had been declined; he did not recall how he became aware the loan was denied.
*727 At the conclusion of trial, the jury answered "no" to the following interrogatory: "Did Hibernia National Bank breach its commitment to American Gulf V, Inc. regarding the 5.5 million dollar loan commitments dated December 18, 1989?" This appeal followed.

DISCUSSION:
On appeal, American Gulf V, Inc. argues that Hibernia answered this suit with a general denial, and at trial Hibernia presented evidence of affirmative defenses that the obligation on the commitment letters was extinguished due to the passage of time and the failure of the borrower to demand a closing. Appellant argues the trial court erred in failing to strike the affirmative defenses and evidence related to these defenses presented by Hibernia Bank because Hibernia failed to plead these affirmative defenses.
An "affirmative defense" raises a new matter, which assuming the allegations in the petition are true, constitutes a defense to the action. Webster v. Rushing, 316 So.2d 111 (La.1975). This type of defense will have the effect of defeating plaintiff's demand on its merits. C.C.P. art. 1005. Louisiana courts have liberally construed article 1005, however, when the defendant answers with a general denial, and fails to plead an affirmative defense, no proof can be offered at trial in support of the defense. Perfection Metal & Supply Co. v. Independent Supply of N.O., Inc., 97-800 (La.App. 5th Cir.1/14/98), 707 So.2d 86.
Appellants are seeking damages for breach of the commitment letters. Thus, the terms and conditions of those commitment letters, including their expiration dates and appellant's failure to request the loans be closed may be raised by Hibernia as a defense to appellant's claim based solely on Hibernia's general denial of appellant's petition. Appellant's assertion that the expiration of the commitment letters is related to an affirmative defense is incorrect. Hibernia presented evidence that the commitment letters for the 5.5 million dollar loan expired under the express provisions of the letters while appellant was seeking approval of the 6.25 million dollar loan. This is not an affirmative defense. Hence, the trial court committed no error in allowing evidence related to the expiration of the commitment letters, and appellant's failure to request the loans be closed.
Although not specifically listed as an assignment of error, in the body of its brief, appellant argues that Hibernia breached the commitment letters. Implicit in this argument is that the jury erred in finding to the contrary.
In Rosell v. ESCO, 549 So.2d 840 (La. 1989), the Court held that before an appellate court can set aside a jury's finding of fact, the court must find that there is no reasonable basis in the record for the finding and the record establishes that the finding is clearly wrong or manifestly erroneous. The Court went on to state "where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." Id. When conflicting testimony presents two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id.
In the case before us, Mr. Bossetta and his accountant, Mr. DeVay, testified that they were aware of the expiration date on the commitment letters for the 5.5 million dollar loan. Mr. Capouch testified that during his employment at Hibernia, there were times when he disregarded the expiration date on commitment letters. Mr. Jobe and Mr. Baay disagreed, testifying that extensions on commitment letters had to be in writing. Mr. Bossetta and Mr. DeVay testified that they never asked for an extension on the commitment letters. Mr. Jobe explained that many times a borrower has contacted more than one *728 bank for financing and will complete the loan at the bank that has the best financing, thus, it is not unusual to have a customer let a commitment letter expire.
Mr. Capouch, as well as Mr. Jobe, Mr. Baay, and Mr. Butler testified that the closing of a loan is controlled by the borrower. Mr. Bossetta and Mr. DeVay testified that they never asked that the 5.5 million dollar loan be closed before the expiration of the commitment letter.
Hibernia took the position that the commitment letters for the 5.5 million dollar loan expired while appellant pursued a larger loan. Mr. Bossetta acknowledged seeking a larger loan, and further testified that when the larger loan was declined, he wanted to proceed with the smaller loan with the additional funds being supplied by Continental. The testimony of Mr. Gibson of Continental did not support Mr. Bossetta's testimony on this point, and the defendant's witnesses testified that they were not aware of any such agreement from Continental.
Mr. Bossetta testified that Mr. Baay and Mr. Jobe informed him Hibernia would not make the 5.5 million dollar loan. Mr. DeVay also testified that he was informed by Hibernia personnel that Hibernia would not make the 5.5 million dollar loan, but was unsure as to the person from Hibernia who informed him of such. Both Mr. Baay and Mr. Jobe emphatically denied telling Mr. Bossetta or Mr. DeVay that Hibernia would not make the 5.5 million dollar loan; rather they testified that it was their understanding that American Gulf V, Inc. wanted the entire 6.25 million and that they simply had no use for the 5.5 million dollars because they had no other source of funding.
They jury obviously believed the testimony of Hibernia's witnesses in finding Hibernia did not breach the loan commitment to appellant. As this finding is clearly supported by the record, we find no manifest error in the jury's verdict.
Appellant lists the "failure to properly charge the jury on burden of proof, waiver, and anticipating breach" as an assignment of error. The only discussion as to this assignment of error in the body of the brief is a listing of three jury charges appellant contends should have been given, which they claim would have altered the outcome of the trial. Appellant does not explain why it contends the jury should have received these specific charges on these issues. We find the charges as to release and extinguishment related to defenses which were not raised by Hibernia. Hibernia simply argued that the commitment letters expired under the terms of the letters themselves, appellant did not request an extension of the letters and appellant never requested that the 5.5 million dollar loan be closed. Accordingly, we find the trial judge did not err in failing to charge the jury on these issues. Appellant also contends the court failed to charge the jury on the doctrine of anticipatory breach, but does not explain how this was relevant, nor how it would have changed the outcome of the trial. According to Rule 2-12.4 of the Uniform Rules of the Courts of Appeal, a specification of error which has not been briefed is deemed abandoned. See Interdiction of Cantu, 97-236 (La. App. 5th Cir.11/25/97), 704 So.2d 320.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.